# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cheryl Ann Evans,                                    Civ. No. 16-2628 (BRT)

       Plaintiff,

v.

Nancy A. Berryhill,                          **MEMORANDUM**
Acting Commissioner of                **OPINION AND ORDER**
Social Security,[1]

       Defendant.

---

Jyotsna Asha Sharma, Esq., Disability Partners PLLC, counsel for Plaintiff.

Gregory G. Brooker, Esq., United States Attorney's Office, counsel for Defendant.

---

BECKY THORSON, United States Magistrate Judge.

       Pursuant to 42 U.S.C. § 405(g), Plaintiff Cheryl Ann Evans seeks judicial review of the final decision of Defendant Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income. This matter is before the Court on the parties' cross-motions for summary judgment, in accordance with D. Minn. LR 7.2(c)(1). (Doc. Nos. 13, 16.) For the reasons stated below, the Commissioner's denial of benefits is not supported by substantial evidence in the record, and the record convincingly establishes that Plaintiff is disabled within the

---

[1]     Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure Rule 25(d), Nancy A. Berryhill is substituted for Carolyn W. Colvin as the Defendant in this action.

meaning of the Social Security Act. Therefore, Plaintiff's motion for summary judgment is granted, Defendant's motion for summary judgment is denied, and this matter is remanded for calculation and an award of benefits.

## BACKGROUND

### I.    Procedural History

Plaintiff applied for Title II disability insurance benefits ("DIB") on May 21, 2013, and for Title XVI supplemental security income ("SSI") on June 30, 2014. (Tr. 17.)[2] For both applications, Plaintiff alleged a disability onset date of October 1, 2008. (Tr. 17, 167.) The Social Security Administration denied Plaintiff's claims initially and upon reconsideration. (Tr. 108–12, 116–18.) Plaintiff then appealed to an Administrative Law Judge ("ALJ"). (Tr. 119–20.) At Plaintiff's request, an ALJ held an in-person hearing on April 15, 2015. (Tr. 39–82.) On April 23, 2015, the ALJ denied Plaintiff's applications. (Tr. 14–38.) The SSA Appeals Council then denied Plaintiff's request for review on May 31, 2016, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–4); *see* 20 C.F.R. § 404.981.

On August 3, 2016, Plaintiff filed this action seeking judicial review pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.) Defendant filed an answer on October 12, 2016. (Doc. No. 10.) The parties have filed cross-motions for summary judgment pursuant to the Local Rules. (Doc. No. 14, Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem."); Doc. No.

---

[2]    Throughout this Order and Opinion, the abbreviation "Tr." is used to reference the Administrative Record. (Doc. No. 11.)

17, Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.").)[3] Plaintiff argues that the Commissioner's denial of benefits should be reversed, and this matter should be remanded for an immediate award of benefits, because the evidence in the record overwhelmingly supports the conclusion that she is disabled due to her agoraphobia. (*See* Pl.'s Mem.) Plaintiff also argues that she cannot work because she cannot leave her home by herself due to her agoraphobia. (*See id.*)

## II.     Factual Background

Plaintiff is a high school graduate who was born on January 9, 1968. (Tr. 49, 190.) Before her alleged onset date, Plaintiff worked as a fabric care aide at a nursing home, an administrative assistant for a collection agency, and most recently, from January 2002 until December 2005, as a tutor/education assistant at an elementary school. (Tr. 196.) In this job, Plaintiff tutored students in math and science and supervised children on the playground and in the lunch room. (Tr. 197.) From January 2002 until October 2009, Plaintiff also worked as a caretaker/leasing agent at her apartment building. (Tr. 196.) Plaintiff did not receive a paycheck for this work because it was a rent reduction job. (Tr. 203.)[4] She has not worked since she lost her tutoring job and stopped working as a leasing agent. Plaintiff currently lives with her longtime boyfriend of thirteen years, and she has a daughter from a previous marriage who is in college. (Tr. 49.)

---

[3]     During the pendency of this appeal, Plaintiff filed a new claim for SSI benefits on June 28, 2016, and was approved on September 4, 2016, on the basis of meeting Listing 12.06, Part C. (Pl.'s Mem. 2.)

[4]     Plaintiff did receive a small paycheck for the last month she lived there because there was no rent to reduce the following month. (Tr. 203.)

At some point in 2007, Plaintiff began experiencing increased anxiety and developed agoraphobia. (*See* Tr. 45, 271–73.) Plaintiff's treating therapist, Dr. Kathleen Wise, MA, LP, diagnosed Plaintiff with panic disorder with agoraphobia and major depression, recurrent severe. (Tr. 326.) Plaintiff's condition left her essentially homebound, except for when she was able to leave with her "safety people"—family members such as her boyfriend, her daughter, and her sister. (Tr. 45.) At the hearing, Plaintiff testified about her condition as follows:

> I get dizzy. The world becomes distorted. I don't know how to—visually distorted. Everything seems crooked and I'm wobbly on my feet. I feel that—you know, I always feel like I'm going to fall down or—everything is just loud and distorted.
>
> . . . .
>
> There's no drive or no sunny side that a person sees to make anything worthwhile. It's just bleak . . . . [E]verything is bleak.
>
> . . . .
>
> [I fear] [p]retty much everything sometimes it feels like. I fear people. I feel like they're going to harm me. I fear people. I—and noise, and everything. Going in the car over 30 miles an hour. I just see doom around every corner. It—I'm not sure how else to describe, you know, all of my fears. But it's crowds, it's rooms that are too small, it's rooms that are too big, it's ceilings that are too low, it's lights that are too bright, it's too dark, it's lots of things. It's life basically.

(Tr. 59–60, 62.)

## III.     The ALJ's Findings and Decision

On April 23, 2015, the ALJ issued a decision denying Plaintiff's applications for benefits. (Tr. 17–33.) The ALJ found that Plaintiff was not disabled as defined by the Social Security Act from October 1, 2008, through the date of the decision. (Tr. 18, 33.)

The ALJ followed the five-step evaluation process dictated by 20 C.F.R. § 404.1520(a)(4), which involves the following determinations: (1) whether Plaintiff is involved in "substantial gainful activity"; (2) whether Plaintiff has a severe impairment that significantly limits her mental or physical ability to work; (3) whether Plaintiff's impairments meet or equal a presumptively disabling impairment listed in the regulations; (4) whether Plaintiff has the residual functional capacity ("RFC") to perform her past work; and (5) if Plaintiff cannot perform her past work, whether the government has shown that Plaintiff can perform other work, and that there is a sufficient number of those jobs available in the national economy. (Tr. 18–19.)

At step one of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 1, 2008. (Tr. 19.) At step two, the ALJ determined that Plaintiff had the following severe impairments: depression, not otherwise specified; major depression, recurrent; agoraphobia; panic disorder with agoraphobia; anxiety; and generalized anxiety disorder. (*Id.*)

Because the ALJ determined that Plaintiff had severe impairments, he continued to step three of the analysis. At this step, a claimant must show that her impairment or combination of impairments meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520(a)(iii). The ALJ relied on the objective medical evidence, in addition to the testimony of Dr. Karen Butler, Ph.D, a neutral medical expert who testified at the hearing, in finding that the claimant's mental impairments do not meet or equal the criteria of Listings 12.04 and 12.06. (Tr. 17, 20.) Beginning with the paragraph B criteria,

the ALJ credited Dr. Butler's opinion that Plaintiff has moderate restrictions in activities of daily living "evidenced by her fairly intact range of activities which reflect that the claimant has the ability to do activities of daily living but is reduced depending on her level of depression and anxiety in any given day." (Tr. 20.) The ALJ did note Plaintiff often "did not take baths for days, which was a reflection of the depth of her depression" (Tr. 20), and could only shop in stores "after hours if accompanied by her significant other or her daughter." (Tr. 21.) Even so, Plaintiff did the laundry, simple cooking, knitted hats, scarves and wash cloths, managed her finances, watched television and did Sudoku puzzles, played computer games, took care of and taught tricks to her dog, and attended to her personal care. (Tr. 20–21.) Plaintiff also cared for her elderly father when he lived independently, exercised, and worked on a deck project with her daughter during the claim period. (*Id.*)

Regarding social functioning, the ALJ discussed Dr. Butler's testimony regarding Plaintiff's relationships, which are "confined within her family as opposed to specific friendships, clubs, hobbies or other activities outside of her home." (Tr. 21.) The ALJ further considered Plaintiff's testimony that "she would have difficulty forming trusting relationships if she became employed, she has fears people are going to harm her, sees doom around every corner and in crowds, and only feels comfortable being around her trusted network of family members and her significant other." (*Id.*) The ALJ found no more than moderate social limitations, however, apparently because Plaintiff watched television in her home with her family and talked on the phone with her sister. (*Id.*)

The ALJ also found moderate difficulties in concentration, persistence or pace, due in part to her activities of daily living. (*Id.*) The ALJ pointed to a June 2013 function report, where Plaintiff indicated she did not need reminders or encouragement to attend to her personal needs, take her medications, or do household chores, but had difficulty paying attention, following written and spoken instructions, and handling stress or changes in routine. (*Id.*) Plaintiff also presented a "constricted affect and dysphoric mood" to her treating providers, but she typically presented as alert and fully oriented with normal speech, thought process, attention, memory, and fund of knowledge, and had no difficulty understanding treatment recommendations, maintaining conversation, or asking appropriate questions. (*Id.*) Plaintiff also answered questions appropriately at the hearing and there was no evidence that Plaintiff did not understand the content of the hearing. (*Id.*) "Resolving conflicts in the evidence," the ALJ found "no more than moderate difficulties in maintaining concentration, persistence, or pace." (Tr. 21–22.)

Finally, the ALJ found no episodes of decompensation, such as psychiatric hospitalization, enrollment in day treatment, or any increase in outpatient psychotherapy for an extended period. (Tr. 22.)

Regarding the paragraph C criteria, the ALJ stated that the record did not reflect "repeated episodes of decompensation, a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause decompensation, or a current history of one or

more years' inability to function outside a highly supportive living arrangement." (*Id.*)[5] The ALJ therefore found that Plaintiff's impairments did not meet or equal a listing.

Before step four, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations: limited to unskilled to semi-skilled tasks; no more than infrequent contacts and superficial contacts with others in a work setting; and she should not be serving the public as a primary part of her job tasks. (Tr. 22.)

The ALJ began by outlining the Plaintiff's allegations:

> The claimant . . . alleges she is disabled and unable to work due to mental health impairments and symptoms, which interfere with her ability to leave her home without people she trust[s], and which causes her to become dizzy, wobbly on her feet and distorts her world when she does leave her home unaccompanied. In addition, the claimant testified as a result of her psychological symptoms, she is only able to drive for short distances in the radius of her house, she only goes to places she can handle, she is often driven to places by her sister and significant other, her future outlook is bleak and she struggles to get out of her bed five to six days out of the month. Further, she testified she has fears of people harming her, fear of noise and of driving over thirty miles per hour and sees doom everywhere around her. Additionally, the claimant stated she would have difficulty forming a trusting relationship with another person if she became employed, did not have the concentration necessary to work and could only concentrate for a short time. The symptoms of claimant's condition have reportedly affected several of her work-related activities, such as memory, completing tasks, concentration, understanding and following instructions.

---

[5] These are the paragraph C criteria for Listing 12.04, not 12.06. 20 C.F.R. Pt. 404, Subpt. P, App 1, § 12.04(C) (effective January 2, 2015 to May 17, 2015). At the time of the ALJ's decision, the paragraph C criteria for Listing 12.06 required a showing that an individual had a "complete inability to function independently outside the area of one's home." *Id.* § 12.06(C).

(Tr. 23–24.) The ALJ found that Plaintiff's allegations were credible "subject to a degree of functional restriction as a result of her mental impairments and symptoms." (Tr. 24.) Thus, the RFC was reduced to accommodate Plaintiff's difficulties in performing complex, stressful work with prolonged or intense social contacts. (*Id.*) However, the ALJ rejected the contention that Plaintiff was completely unable to work "due to significant inconsistencies in the records as a whole and a lack of objective evidence to support her complaints." (*Id.*)

First, the ALJ gave "great weight" to the conclusions of Dr. Butler, an expert in clinical psychology, who "carefully scrutinized the comprehensive, objective, longitudinal records and had the opportunity to observe and question the claimant at the hearing." (Tr. 25.) Dr. Butler opined that the medical evidence described someone who could perform unskilled or semi-skilled work, but with only brief, superficial and infrequent contacts with others in a job where serving the public is not a primary task. (*Id.*) This was in spite of Dr. Butler's "concerns" about inconsistencies in the record as to the severity of Plaintiff's mental health symptoms, her daily functioning, and her compliance with prescribed medications. (Tr. 24.) Plaintiff was functioning well and independently, but had difficulty being outside of her home and was not consistently compliant with her treatment medications. (*Id.*) Additionally, the recommended treatment for Plaintiff's anxiety would be incremental exposure to the things making her anxious, but Plaintiff had never undergone such treatment and was now seeking a new therapist. (Tr. 24–25.)

The ALJ noted that Plaintiff's treatment had been conservative, primarily individual psychotherapy sessions, and she often failed to follow through with treatment recommendations or consistently comply with prescribed medications. (Tr. 25.) The ALJ also observed that Plaintiff's symptoms are typically related to situational stressors, such as her inability to work outside of her home, finances, her shaky relationship with her boyfriend, her elderly father's living arrangement, who recently suffered a stroke, and her daughter moving away to college. (*Id.*) The ALJ cited a comment made by Plaintiff's treating therapist, Dr. Wise, who stated that Plaintiff was stressed about finances, yet Plaintiff responded with "shock" when it was suggested that she could eventually return to work. (*Id.*)

The ALJ asserted that "overall" the records demonstrate that Plaintiff's symptoms are "generally effectively controlled with medication management and the claimant acknowledged improvements in her mental health symptoms." (Tr. 26.) The ALJ also cited to the testimony of Dr. Butler, however, who stated that Plaintiff's "symptoms did not respond to some medications while other medications improved or reduced the claimant's symptoms although there is no indication in the medical evidence any single medication completely alleviated her mental health symptoms." (*Id.*) The ALJ then discussed in some detail Plaintiff's continuing failure to her take her medications or adhere to suggestions made by various providers such as Dr. Wise, Dr. Steven Clarke, Dr. Dawn Graham, and Dr. Richard Gebhart. (Tr. 25–27.) For example, on January 11, 2011, Dr. Wise noted that Plaintiff had not taken her antidepressant medication, prescribed to her a year earlier by her primary care provider, because she did not like

taking medications. (Tr. 27.) In May 2012, Plaintiff reported to Dr. Gebhart that she stopped taking her medication three months prior and had developed a "who cares" attitude. (*Id.*) Dr. Wise also stated in June 2013 that Plaintiff "has a variety of reasons why she cannot possibly follow through on any treatment suggestions and that everything appears to be an effort which she cannot muster." (*Id.*) And in August 2013, Dr. Clarke noted that Plaintiff unilaterally stopped taking one of her medications and determined that her antidepressant was helpful enough, and that she would continue to try making changes in her life but not her medication. (*Id.*) The ALJ concluded that Plaintiff's "unwillingness to follow prescribed medical treatment seriously reduces the credibility of claimant's allegation that she is disabled." (*Id.*)[6]

In light of the foregoing, the ALJ found that Plaintiff's "comprehensive allegations of disability due to her various mental impairments are not completely credible," and the objective medical evidence did not corroborate the alleged level of restrictions. (Tr. 28–29.) Moreover, Plaintiff's daily activities, discussed above, suggested to the ALJ that Plaintiff is "more active than alleged." (Tr. 29.)

Turning to the opinion evidence, the ALJ gave "some weight" to two medical source statements by Dr. Wise, dated March 2011 and June 2013. (Tr. 29.) In the March 2011 statement, Dr. Wise stated that Plaintiff "had several situational stressors in her life,

_____

[6]     The ALJ also considered "several assessed GAF scores of 50 in the file, which could be considered a form of medical opinion." (Tr. 28.) The ALJ reasoned that the use of these scores is "severely impaired by a lack of reliability, validity, and subjective interpretation," and they are "not representative of claimant's generally robust activities." (*Id.*) Thus, the ALJ gave them little weight. (*Id.*)

had not been compliant with prescribed medications, did not seem interested in eventually returning to work and that it was Ms. Wise's hope that the claimant could find her way back to employment." (*Id.*) In the June 2013 statement, Dr. Wise noted that Plaintiff's symptoms "had worsened despite numerous suggestions and interventions because of the claimant's inability to follow through with treatment recommendations and her noncompliance with prescribed medications." (*Id.*) Dr. Wise further stated her belief that Plaintiff "wanted to be taken care of," that she had a "variety of excuses" for why "she could not follow through on treatment recommendations and that working with the claimant was a challenge in achieving any treatment goals." (Tr. 29–30.)

The ALJ gave "little weight," however, to two mental functioning questionnaires completed by Dr. Wise in August 2013 and February 2015. (Tr. 30.) In both questionnaires, Dr. Wise opined that Plaintiff has a number of mental limitations that would affect her work-related abilities, and that she would likely miss more than four days per month due to her mental impairments and symptoms. (*Id.*) The ALJ gave little weight to these opinions because they are "inconsistent with her own treatment notes and other medical source statements . . . in which she described the claimant as being noncompliant with prescribed medication and reluctant to follow through with treatment recommendations." (Tr. 31.) In addition, the ALJ rejected Dr. Wise's opinion because it was not consistent with the medical evidence, overall record, conservative course of treatment, mental status examinations and observations, Plaintiff's daily functioning, and

the expert opinions of Dr. Butler and the State Agency mental health consultants. (*Id.*)[7]

For the same reasons, the ALJ gave little weight to Dr. Wise's statement in an April 2015 questionnaire that Plaintiff's limitations likely existed in January 2011 when she first started treating Plaintiff for her mental impairments. (*Id.*)

The ALJ then addressed statements submitted by Plaintiff's boyfriend and her sister. (*Id.*) The ALJ gave these statements some weight, but rejected them to the extent they were inconsistent with the objective medical evidence, course of treatment, mental status examinations and observations, and Plaintiff's reported daily activities. (*Id.*) Moreover, the ALJ stated that the statements might be influenced by their relationships and loyalties to Plaintiff. (*Id.*) Finally, the ALJ noted that Plaintiff's failure to seek employment since losing her last job "reflects negatively on the overall credibility of the claimant's allegations regarding her subjective complaints of complete disability." (*Id.*)

At step four, the ALJ ultimately determined, based on all of the above, that Plaintiff is unable to perform any past relevant work. (Tr. 32.) Relying on the testimony of a vocational expert, the ALJ then found at step five that there are a significant number of jobs in the national economy that Plaintiff can perform, and as a result, Plaintiff is not disabled within the meaning of the Social Security Act. (Tr. 32–33.)

---

[7] The ALJ gave "some weight" to the opinions of the State Agency mental health consultants, who found that Plaintiff had moderate restrictions in activities of daily living and in maintaining concentration, persistence or pace, but gave less weight to their opinions that Plaintiff only had mild limitations in maintaining social function. (Tr. 29.) The ALJ stated that Plaintiff was "further limited in social functioning due to the claimant's testimony and the testimony and opinions of Dr. Butler, whose opinions have been given great weight here." (*Id.*)

# DISCUSSION

## I.     Standard of Review

Congress has established the standards by which Social Security disability insurance benefits may be awarded. The SSA must find a claimant disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairments must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proving that she is entitled to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a). Once the claimant has demonstrated that she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the [RFC] to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

The Court has the authority to review the Commissioner's final decision denying disability benefits to Plaintiff. 42 U.S.C. § 405(g); *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). On review, the Court must determine whether the ALJ's decision to deny benefits is based on legal error, and whether the findings of fact are supported by

substantial evidence in the record as a whole. *Wildman v. Astrue*, 596 F.3d 959, 963 (8th Cir. 2010); *see also Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) ("We will uphold the Commissioner's decision to deny an applicant disability benefits if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). This standard is "something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994). The Court thus considers evidence that supports the Commissioner's decision and evidence that detracts from it. *Kluesner*, 607 F.3d at 536. The Court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003). If, after review, the record as a whole supports the Commissioner's findings, the Commissioner's decision must be upheld, even if the record also supports the opposite conclusion. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008); *Goff v. Barnhart* 421 F.3d 785, 789 (8th Cir. 2005).

## II.    Analysis of the ALJ's Decision

Plaintiff argues that the ALJ erred at step three when he failed to evaluate whether her agoraphobia met the criteria for the paragraph C criteria of Listing 12.06. (Pl.'s Mem.

23–26). At the time of the ALJ's decision,[8] the paragraph C criteria required a showing that the claimant be completely unable to function independently outside of the home. (Pl.'s Mem. 23–26.) Plaintiff also argues that the ALJ erred when he did not account for Plaintiff's expected absences from work in his RFC. (*Id.* at 26–28.) Finally, Plaintiff argues that the ALJ erred when he discounted Plaintiff's credibility due to her failure to follow prescribed treatment, failed to analyze whether the prescribed treatment would restore Plaintiff's capacity to work, and did not give proper notice about these issues. (Pl.'s Mem. 28–36.) Defendant argues that there is substantial evidence to support the ALJ's step three finding, his RFC finding, and that the ALJ properly considered Plaintiff's noncompliance with treatment. (Def.'s Mem. 5–18.)

### A.    Plaintiff Meets the Paragraph C Criteria of Listing 12.06

At the time of the ALJ's decision, Listing 12.06 (Anxiety Related Disorders) provided as follows:

> 12.06 Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

---

[8]    The criteria have been amended, but the Court applies the regulation in effect at the time of the ALJ's decision. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138 n.1 (Sept. 26, 2016) ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."); *see also Fleming v. Barnhart*, 284 F. Supp. 2d 256, 267 (D. Md. 2003) (finding that the regulation in effect at the time of the ALJ's decision is the one that applies).

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or

b. Autonomic hyperactivity; or

c. Apprehensive expectation; or

d. Vigilance and scanning;

or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App 1, § 12.04(C) (effective January 2, 2015 to May 17, 2015).

As noted above, the ALJ found that Plaintiff did not meet the paragraph B criteria of Listings 12.04 and 12.06. (Tr. 20–22.) The ALJ also found that Plaintiff did not meet the paragraph C criteria, but only for Listing 12.04; the ALJ did not mention or discuss whether Plaintiff is "completely" unable to "function independently outside the area of" her home. Because the record clearly demonstrates that Plaintiff is unable to function independently outside the area of her home due to her anxiety-related agoraphobia, this was an error requiring remand for an immediate award of benefits.[9]

As Plaintiff testified, her "main difficulty" is "[l]eaving the home, being anywhere without one of my safety trusted people." (Tr. 56.) The record is replete with examples supporting this assertion. For example, the only way Plaintiff can visit her father in his assisted living facility, which is only eight doors away from her home, is if she is accompanied by her boyfriend Ben, her sister, or her daughter. (Tr. 61.) Plaintiff also testified about her inability to attend her daughter's concert at Orchestra Hall, an event

---

[9] The parties appear to agree that Plaintiff meets the paragraph A criteria, and they are not at issue in this appeal. The ALJ discussed the paragraph A criteria after step three, when he addressed Plaintiff's RFC. (Tr. 24.)

that she predicted would "probably haunt [her] forever." (Tr. 57.) Aside from her testimony at the disability hearing, Plaintiff also submitted a detailed journal of her daily activities from February 11 through March 24, 2015. (Tr. 248–57, 259–69.) In one instance, Plaintiff describes "forcing" herself to go to Target with Ben. (Tr. 252–53.) Plaintiff waited until the store was almost closed to avoid crowds and long waiting lines, and employed the "strategy" planned from the night before of staying "in the aisle that runs along outside walls and Ben went in to get what was needed from the aisles." (Tr. 253.) Plaintiff then spent the next day in bed because she was "exhausted" from the Target trip. (*Id.*)

Plaintiff's accounts are corroborated by the statements submitted by her boyfriend and her sister. Plaintiff's boyfriend wrote:

> There are numerous areas of her life that have been affected. She can no longer walk our dog, which she used to love doing. Special plans need to be made for even the most ordinary events. Driving has become a thing of the past, any routines of everyday life must include another person to drive. Going to the store, doctor appointments, visiting family, including helping take care of her dad . . .

(Tr. 272.) Similarly, Plaintiff's sister wrote:

> My sister used to love walking her dog. I am sure she would love to continue to do so but I know she cannot because of her anxiety. She relies on others to drive her to the grocery store, doctor's appointment etc. She cannot function in day to day activities such as buying food and taking care of her health without the help of family and/or friends.

(Tr. 273.)

The ALJ, as noted above, found Plaintiff's "comprehensive allegations of disability due to her various mental impairments . . . not completely credible." (Tr. 28.)

The ALJ did not, however, question the veracity of Plaintiff's testimony regarding how difficult it was for her to leave her home by herself, and the evidence cited in his opinion does not demonstrate that Plaintiff is able to function independently outside the area of her home. Instead, the evidence cited by the ALJ largely supports the contrary conclusion. (*See* Tr. 21, 25, 29.) Even in the context of stating that Plaintiff was "more active than alleged," the ALJ cited evidence which demonstrates that Plaintiff is essentially homebound. (Tr. 29 (stating Plaintiff "did household chores such as cooking, making microwavable meals, cleaning, laundry and changing light bulbs, attended to her personal care, shopped by computer and in stores *after hours*, visited her aging father at his assisted living facility once a week *accompanied by her sister or significant other*, worked on crafts such as sewing and painting, gardened, read, played video games and watched television") (emphasis added).)

The ALJ also relied heavily on the opinion of Dr. Butler. Much like the ALJ, however, Dr. Butler did not doubt Plaintiff's testimony about her difficulties in leaving home without her "safety people." Instead, Dr. Butler acknowledged that "the record does reflect . . . the difficulties she has spoken to," and "clearly the record describes somebody who is not functioning well and has difficulty being outside of their home and functioning *independently*." (Tr. 73 (emphasis added).)

For the foregoing reasons, the ALJ erred when he failed to address whether Plaintiff met the paragraph C criteria of Listing 12.06, and the evidence of record convincingly demonstrates that Plaintiff's impairments resulted in a complete inability to function independently outside the area of one's home.

**B.**     **The ALJ's RFC Failed to Account for Plaintiff's Expected Absenteeism**

Even if it could be argued that Plaintiff does not meet or equal Listing 12.06—that is, if Plaintiff is not *completely* unable to function independently outside the area of her home—Plaintiff is still entitled to an immediate award of benefits because of the number of absences she is expected to incur in a given month due to her severe impairments.

The ALJ limited Plaintiff to work involving unskilled to semi-skilled tasks, no more than infrequent contacts and superficial contacts with others in a work setting, and no serving the public as a primary part of her job tasks. (Tr. 22.) However, the ALJ rejected Dr. Wise's opinion that Plaintiff would likely miss more than four days per month on the grounds that it was "inconsistent with her own treatment notes and other medical source statement . . . in which she described the claimant as being noncompliant with prescribed medication and reluctant to follow through with treatment recommendations." (Tr. 31.) The ALJ also rejected Dr. Wise's opinion because it was "not consistent with the medical evidence, overall record, conservative course of treatment, mental status examinations and observations, the claimant's daily functioning and the expert opinions of Dr. Butler and the State Agency mental health consultants, which have been given weight in finding the claimant not disabled." (*Id.*) These are not good reasons for rejecting Dr. Wise's opinion about Plaintiff's expected absences. *See Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) ("Whether the ALJ gives the opinion of a treating physician great or little weight, the ALJ must give good reasons for doing so.").

First, the ALJ did not consider why Plaintiff may have been reluctant to take prescribed medication or to follow treatment recommendations. Federal courts including the Eighth Circuit "have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, [is] neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009). Even if Plaintiff could be faulted for not taking prescribed medicine, Dr. Butler testified that "the record does not say that any medications she has taken has fully taken those symptoms away." (Tr. 75.)[10] Aside from medications, Dr. Butler testified that the treatment for anxiety is to "face the things you're anxious about and to do that in small doses." (Tr. 73.) This creates a "Catch-22" for someone like Plaintiff, who is deathly afraid of trying such things in the first instance. Put another way, a "psychosomatic anxiety-related disorder such as agoraphobia may defy any generally accepted prescribed treatment requiring the will of the individual claimant to recover." *Zeitz v. Sec. of Health & Human Servs.*, 726 F. Supp. 343, 349 (D. Mass. 1989).[11]

---

[10]     Plaintiff's lawyer asked Dr. Butler if it was "more likely than not that she would incur monthly absences at work even with consistent medication? The record does show that she's had treatment with medications, which has not completely reduced her symptoms. So if she was completely consistent with medications would her anxiety symptoms likely cause her to incur monthly absences from work?" (Tr. 76.) Dr. Butler was "unable to answer that question." (*Id.*)

[11]     Additionally, as discussed in the following section, the Commissioner cannot rely on Plaintiff's alleged failure to follow treatment recommendations because Plaintiff did not have notice that this would be an issue at the disability hearing.

Second, the ALJ was wrong in stating that Dr. Wise's opinion is inconsistent with the overall record. As discussed in some detail above, the record demonstrates that Plaintiff, at minimum, is severely impaired in her ability to leave the home by herself. If Plaintiff can barely handle going to the store during off hours and with her boyfriend, then she will not be able to handle a regular work schedule. This evidence corroborates Dr. Wise's ultimate concern that Plaintiff "could not get to a job" (Tr. 350), and that "she would not get there" (in response to the question, "Please describe any other reasons not covered above why your patient would have difficulty working at a regular full-time job on a sustained basis"). (Tr. 344.) Dr. Butler, whose opinion was given "great weight" by the ALJ, conceded that more than four absences per month is a "reasonable estimate" based on her review of the record. (Tr. 75–76.)

For the foregoing reasons, the ALJ's RFC should have included the limitation that Plaintiff is expected to miss at least four days of work per month. At the hearing, the vocational expert testified that the customary employer tolerance for absences in the unskilled workplace is no more than two absences per month, and if someone was expected to be absent more than four days per month, that person would not be able to perform the identified jobs. (Tr. 80.) The vocational expert also testified that an individual who needed to have "safety people" present would not be able to perform these jobs. (*Id.*) Therefore, the Commissioner failed to meet its burden of demonstrating that Plaintiff can perform a significant number of jobs in the national economy, and Plaintiff is entitled to an immediate award of benefits.

### C.    The ALJ Erred When He Discounted Plaintiff's Credibility Due to Her Alleged Failure to Follow Prescribed Treatment

The primary justification for the ALJ's denial of benefits is his determination that Plaintiff's "unwillingness to follow prescribed medical treatment seriously reduces the credibility of [her] allegation that she is disabled." (Tr. 27.) This was an errant conclusion.

Failure to follow a prescribed course of medical treatment without good reason may be a sufficient reason to deny benefits. *See Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). According to the regulatory guidance,

> [a]n individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability.

SSR 82-59, Titles II and XVI: Failure to Follow Prescribed Treatment, 1982 WL 31384, at *1 (S.S.A.). However, the SSA may determine that an individual "failed" to follow treatment only where all of the following conditions exist:

> 1.    The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) . . . ; and
>
> 2.    The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
>
> 3.    Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and
>
> 4.    The evidence of record discloses that there has been refusal to follow prescribed treatment.

(*Id.*)

The record does not show that Plaintiff was prescribed treatment that is "clearly expected to restore capacity to engage in any SGA." To the contrary, as noted above, Dr. Butler testified that "the record does not say that any medications she has taken has fully taken those symptoms away." (Tr. 75.) Also, while Dr. Butler referenced the suggested treatment for anxiety and agoraphobia—"to face the things that you're anxious about and to do that in small doses" (Tr. 73)—there is no evidence in the record that Plaintiff was actually *prescribed* such treatment. Instead, as Dr. Wise explained, Plaintiff was not "receptive to ideas" and had "a variety of reasons why she cannot possibly follow through on any suggestions. Everything appears to be an effort which she cannot muster." (Tr. 327.) Therefore, even if prescribed, the evidence supports that Plaintiff's mental health issues provide a "justifiable excuse." *Pate-Fires*, 564 F.3d at 945; *see also* SSR 82-59, 1982 WL 31384, at *1 ("Where SSA makes a determination of 'failure,' a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable.").

Finally, SSR 82-59 "mandates that the individual must be informed of the effect of compliance on the application for benefits," and "[a]s a procedural matter, if the commissioner fails to provide the claimant with an opportunity to address the issue, he loses the ability to assert it as a reason for denying disability benefits." *Bailey v. Colvin*, 121 F. Supp. 2d 849, 859 (S.D. Iowa 2015). The ALJ did not provide notice that noncompliance would be an issue at Plaintiff's hearing. (Tr. 139–40, 145.). If, as here, "the issue of compliance with medical treatment arises for the first time at the hearing level or at the Appeals Council level, 'and it has been 12 months after onset, a favorable

25

decision will be issued, and the case will be referred for development of failure to follow prescribed treatment.'" *Id.* (quoting SSR 82-59). Since Plaintiff's 2015 hearing occurred well after her alleged onset date of October 1, 2008, Plaintiff is entitled to a favorable decision for the reasons already stated, and the Commissioner cannot rely on Plaintiff's alleged noncompliance with treatment recommendations to justify the denial of benefits. *Id.* at 859–60 ("It may very well be that Plaintiff's failure to follow prescribed medical treatment is a reason to terminate her benefits, but she must be given notice of that inquiry, the opportunity to present her reasons for that failure to follow treatment if it exists, and the opportunity to comply with the treatment recommendations of her treating physicians(s).").

### D.    Plaintiff is Entitled to an Immediate Award of Benefits

The typical remedy when the ALJ's disability determination is not supported by substantial evidence in the record as a whole is to remand for further administrative proceedings. *See Fishbaugher v. Astrue*, 878 F. Supp. 2d 939, 955 (D. Minn. 2012) (citing *Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998)). Reversal and remand for an immediate award of benefits, however, is the appropriate remedy where the record is fully developed and overwhelmingly supports a finding of disability. *Id.* (citing *Pate-Fires*, 564 F.3d at 947).

For the reasons already stated, the record overwhelmingly supports the following conclusions: (1) Plaintiff meets the paragraph C criteria for Listing 12.06 due to her inability to function independently outside the area of her home; and (2) Plaintiff cannot perform substantial gainful activity due to the large number of expected absences on a

monthly basis. Therefore, reversal and remand for an immediate award of benefits is the correct remedy in this case.

## ORDER

Based on the foregoing, and all the files, records, and submissions herein, **IT IS HEREBY ORDERED** that:

1.     Plaintiff's Motion for Summary Judgment (Doc. No. 13) is **GRANTED**;

2.     Defendant's Motion for Summary Judgment (Doc. No. 16) is **DENIED**; and

3.     The Commissioner's denial of benefits is **REVERSED**, and this matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for calculation and award of benefits with a disability onset date of October 1, 2008.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date: August 31, 2017.                    *s/ Becky R. Thorson*_____
                                          BECKY R. THORSON
                                          United States Magistrate Judge